IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

UNITED STATES OF AMERICA,    )
                             )
            Plaintiff,       )
                             )
     v.                      )    Criminal Action No.
                             )    05-00414-01-CR-W-DW
MICHAEL PULLUAIM,            )
                             )
            Defendant.       )

**REPORT AND RECOMMENDATION TO DENY
DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

Before the court is defendant's motion to suppress evidence seized from 451 Highland on the ground that the consent to search given by defendant's mother was the result of coercion and threats and was therefore involuntary. I find that Joyce Pulluaim voluntarily consented to the search of her residence. Therefore, defendant's motion to suppress the evidence seized from the residence should be denied.

*I.   BACKGROUND*

At approximately 9:30 p.m. on January 12, 2005, police were dispatched to 425 Highland. The victim of the reported assault was standing outside and told officers that the male suspect was running through the housing complex. Officers observed a black male matching the victim's description attempt to enter the rear door of the apartment at 451 Highland with a key. The suspect ignored officers' shouts

to stop and entered the apartment, leaving the keys in the door. Officers were unable to get inside the door. A short time later, the suspect emerged and was arrested. Officers entered the residence; contacted defendant's mother, Joyce Pulluaim, the occupant of the residence; and obtained her consent to search. During the search, police recovered a large quantity of individually wrapped plastic bags of marijuana and crack cocaine, two loaded handguns, a loaded shotgun, ammunition, and scales.

On November 15, 2005, an indictment was returned charging defendant with possession with intent to distribute crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B). Defendant filed the instant motion to suppress on May 9, 2006 (document number 24). Defendant states in his motion that his mother, Joyce Pulluaim, passed away in March 2006. He argues that her consent was the result of threats that she would lose her Section 8 housing. At my direction, defendant filed a supplemental motion on the issue of standing on May 16, 2006 (document number 26). The government filed a response to the motion on May 30, 2006 (document number 27). On May 31, 2006, I held an evidentiary hearing on defendant's motion to suppress. The government appeared by Assistant United States Attorney Jane

2

Brown.  The defendant was present, represented by Ronald

Partee.  The following witnesses testified:

> 1.  Officer Garrett Polich, Kansas City, Missouri,
>     Police Department.
>
> 2.  Officer Sabrina Coleman, Kansas City, Missouri
>     Police Department.
>
> 3.  Officer Brian Stockman, Kansas City, Missouri
>     Police Department.
>
> 4.  Detective Gary Snyder, Kansas City, Missouri,
>     Police Department.
>
> 5.  Detective Santiago Garza, Kansas City, Missouri,
>     Police Department.
>
> 6.  Christopher Pulluaim, defendant's brother.

In addition, the following exhibits were marked and

admitted into evidence:

> P. Ex. 1  Consent to Search form signed by Joyce
>           Pulluaim.
>
> P. Ex. 2  Kansas City, Missouri, Police report dated
>           January 12, 2005.
>
> P. Ex. 3  Kansas City, Missouri, Police investigative
>           report.
>
> D. Ex. 1  Affidavit of Christopher Pulluaim.
>
> D. Ex. 2  Kansas City, Missouri, Police investigative
>           report dated January 12, 2005.

## II.  *EVIDENCE*

On the basis of the evidence presented at the

suppression hearing, I submit the following findings of

3

fact:

1.   On January 12, 2005, at approximately 9:30 p.m.
Officers Garrett Polich and Sabrina Coleman were called to a
disturbance involving a tall black man armed with a weapon
wearing blue jeans and a puffy coat at 425 Highland in
Kansas City, Missouri (Tr. at 8-9, 19, 23, 27, 33).  When
they arrived, there were two females out front, very
hysterical, yelling that there was a man running through the
apartment complex with a gun and he had been involved in the
disturbance (Tr. at 8, 17, 28).  The women were pointing in
a southeast direction yelling, "There he goes!  There he
goes!", and Officers Polich and Coleman observed a man in a
dark coat and blue jeans running through the apartment
complex (Tr. at 9, 19, 28).

2.   Officer Polich ran after the man, but he lost
sight of him (Tr. at 9, 17, 18).  Meanwhile, Officer Coleman
drove around the building in the direction the suspect had
been running (Tr. at 28-29).  Officer Coleman got out of the
car and met with Officer Polich and were trying to figure
out which direction the suspect had run when they observed a
man matching the description of the suspect they had been
chasing (Tr. at 9-10, 29).  The man was wearing blue jeans
and a dark puffy coat and was walking from a wooded area at

4

the side of the building near where Officer Polich had lost sight of the suspect (Tr. at 9-10, 18, 29). It appeared to Officer Polich that the suspect had been hiding in the wooded area on the side of the building (Tr. at 18).

3.    Officer Polich told the man to stop where he was, but the man ran to the back of 451 Highland and went inside using a key (Tr. at 10, 18, 35). The man shut the door behind him but left the key in the lock (Tr. at 10, 20). Every time Officer Polich attempted to turn the key to unlock the door, someone on the inside relocked it (Tr. at 10-11, 20, 35-36). Officer Polich, remembering that the suspect was reportedly armed, stepped back and then called for more officers so the building could be surrounded (Tr. at 11).

4.    About a minute after he had called for backup, additional help arrived (Tr. at 11). Officer Brian Stockman was one of the back-up officers (Tr. at 40). With officers in both the front and back of the residence, defendant stepped outside (Tr. at 11, 20). He was no longer wearing the coat Officers Polich and Coleman had seen him wearing when he ran into the residence (Tr. at 12, 30). Defendant had his hands up and said, "You've got the wrong guy." (Tr. at 12, 30). Defendant came out of the residence about four

Case 4:05-cr-00414-DW   Document 32   Filed 06/26/06   Page 5 of 21

or five minutes after he had gone inside (Tr. at 20, 30).
He was taken into custody (Tr. at 12, 30, 36-37).

5.   Defendant was asked why he ran, and he said he ran
because he was scared (Tr. at 36).

6.   Officer Stockman had been advised that the suspect
had possibly gotten rid of a weapon inside the residence and
had then come back outside (Tr. at 41).  Officers Stockman
and Williams entered the house (Tr. at 12).  Officer Polich
stayed outside (Tr. at 12).  Officers Stockman and Williams
contacted an elderly female, Joyce Pulluaim, who was on the
first floor of the residence, and asked if the residence was
hers (Tr. at 41-42, 47, 48, 62).  She said it was (Tr. at
42).  Officer Stockman explained that there was possibly a
weapon in her house and the police were concerned for their
safety and the other occupants of the residence (Tr. at 42).
He asked if he could look for the weapon, and Mrs. Pulluaim
said, "yes" (Tr. at 42).

7.   The officers searched the immediate area inside
the doorway, which would be the most likely place for
defendant to have hidden a weapon (Tr. at 42).  The officers
then asked Mrs. Pulluaim if there were any other people in
the residence, whether defendant had gone upstairs, where
defendant had gone when he was in the residence (Tr. at 42).

6

Mrs. Pulluaim said defendant had gone upstairs (Tr. at 42, 47, 49). At that point, no officer had yet been upstairs (Tr. at 48).

8. Detective Snyder, who is on the Community Action Team and had experience talking to people in non-arrest, non-custodial situations, went in the residence to talk to Mrs. Pulluaim (Tr. at 55, 64). The officers took Mrs. Pulluaim to the kitchen from the living room area and Detective Snyder explained to her that it was dangerous to have a weapon in the residence (Tr. at 43, 44). He told her the police believed there was contraband in the apartment, and he asked if the officers could go upstairs, and she said, "yes" (Tr. at 42).

9. There was no one else in the room with Mrs. Pulluaim and Detective Snyder during this conversation (Tr. at 55). Detective Snyder did not raise his voice during the conversation (Tr. at 56).

10. Detective Snyder told Mrs. Pulluaim that she could refuse consent; he told her that if she did not want them to search certain areas of the residence, she could say so; and that she could tell them to stop searching at any time (Tr. at 56). Mrs. Pulluaim said she wanted the police to search the residence and get anything out of there that was not

7

supposed to be there (Tr. at 56). Mrs. Pulluaim signed a consent to search form (Tr. at 44; P. Ex. 1). No one said anything to Mrs. Pulluaim about losing her apartment or about Section 8 housing (Tr. at 44, 56-57). At the time, Detective Snyder did not know that the apartments were Section 8 housing (Tr. at 57).

11. Detective Snyder forgot to sign the consent form as a witness because as the form was being signed by Mrs. Pulluaim, his sergeant arrived and asked to see Detective Snyder outside (Tr. at 58, 63).

12. While clearing the residence for any other suspects or anyone who did not belong in the residence, the officers located the weapon in an upstairs bedroom (Tr. at 42-43, 50). The officers also observed illegal drugs in plain view (Tr. at 43).

13. Detective Garza arrived one hour to an hour and a half after defendant was arrested (Tr. at 13). The search of the residence for evidence had been completed at that point (Tr. at 24, 38, 50). Officer Polich was inside the residence when Detective Garza arrived (Tr. at 13-14). Detective Garza was wearing jeans, a t-shirt, and a baseball cap (Tr. at 32, 67).

8

14. Someone gave Detective Garza the consent-to-search form signed by Mrs. Pulluaim (Tr. at 68-69). He wanted to make sure she had understood what her rights were when she signed that form (Tr. at 69). Officer Polich was in the living room, and Detective Garza sat on the living room couch with Joyce Pulluaim (Tr. at 14, 23). Officer Coleman was standing next to Detective Garza (Tr. at 32). There was also a young girl and a teenaged boy in the living room (Tr. at 23, 71).

15. Detective Garza explained in detail who he was and what the officers were doing there (Tr. at 69). He asked her if she had signed the consent-to-search form, and she said that she had (Tr. at 69). He asked her if she understood it, and she said she did (Tr. at 69). He read it to her again, and he asked if she would be willing to sign it a second time after they had recovered everything (Tr. at 69). She said she would (Tr. at 69).

16. Mrs. Pulluaim signed the consent-to-search form again (Tr. at 70). Officers Polich and Coleman saw Mrs. Pulluaim sign the consent-to-search form, and they signed as witnesses (Tr. at 15, 39). Officer Polich observed no threats or coercion, and he observed Mrs. Pulluaim to be very cooperative and respectful (Tr. at 15). Officer

9

Coleman observed that Detective Garza was "calm, cool, and collected", and Mrs. Pulluaim's demeanor was fine other than being upset that her son had contraband in her home (Tr. at 32). Officer Stockman observed that Detective Garza's demeanor was very professional as he introduced himself and explained why he was there (Tr. at 45).

17. This was the second time Mrs. Pulluaim signed a consent-to-search form, and neither Officer Polich nor Office Coleman observed her first signature (Tr. at 24-25, 31, 38).

18. While Detective Garza was talking to Mrs. Pulluaim, she asked him if she stood to lose her Section 8 housing (Tr. at 70). He said he did not know, that it had nothing to do with their investigation and he could not give her an answer either way (Tr. at 70). He told her that her cooperation was "definitely the right thing", but he could not give her any clear-cut answer about her housing (Tr. at 70).

19. Defendant's brother, Christopher Pulluaim, testified at the hearing. His testimony was as follows:

a. Christopher was 17 years old at the time of the incident at issue (Tr. at 77). He lived at 451

Highland with his mother and his niece, Sierra Taylor (Tr. at 77).

b. At 9:30 on January 12, 2005, Christopher was upstairs in bed (Tr. at 79). His mother and niece were in their bedroom (Tr. at 79). The lights in the residence were off (Tr. at 79).

c. Christopher was awakened by flashlights in the window (Tr. at 79). Officers came upstairs yelling, "Police" (Tr. at 80). The lights were off upstairs other than a light on in the hallway (Tr. at 80). Mrs. Pulluaim and Sierra Taylor were still upstairs (Tr. at 80). The police came into Christopher's room with guns drawn and asked where another person was (Tr. at 81). He said there was no other person (Tr. at 81). The police were yelling, "where's the money, where's the guns" (Tr. at 82).

d. Christopher testified that he did not hear anyone come upstairs before the police ran up asking for the other person and the money (Tr. at 86).

e. A female police officer took Christopher, his mother, and Sierra downstairs to the living room where they all sat together (Tr. at 81-82).

11

f.   When Christopher got downstairs, he saw that
lights were on and an officer was talking to his mother
in the kitchen (Tr. at 83).  He heard an officer
telling his mother that is she didn't sign the papers,
she would lose the house or go to jail if they found
anything in the house (Tr. at 84).

20.  I do not find Christopher Pulluaim's testimony
credible for the following reasons.

a.   Christopher Pulluaim testified that his mother was
still upstairs when police came upstairs looking for
"another person".  However, the officers testified that Mrs.
Pulluaim was downstairs when they entered, and they asked
her where defendant had gone when he was in the residence
and she said that he had gone upstairs.  If Mrs. Pulluaim
had remained in her bedroom, she would not have known where
defendant had gone in the residence during the few minutes
he was inside.

b.   Christopher testified that police woke him asking
where the other person was, yelling, "Where is the money?"
At the time the police entered the residence, defendant was
already outside, so it makes no sense that police would be
asking where the person was.  Police were originally called
to a disturbance involving a man with a weapon, not a

12

robbery or a drug transaction; so it also makes no sense that they would be asking where the money was.

c.    Christopher testified that he did not hear anyone come upstairs before the police ran in, but since defendant's gun was found upstairs and his mother said he had gone upstairs, clearly someone was up there before the police were.  Christopher may not have been awake or heard them, but the evidence establishes that at least defendant was upstairs before police were.

d.    Christopher said that a female officer took him downstairs after he was awakened, but the only female officer present was Officer Coleman who testified that she remained outside after defendant exited the residence (Tr. at 30).

e.    Christopher testified that he, his mother, and his niece were brought downstairs and were seated in the living room together.  However, he also testified that when he came downstairs, he saw that the lights were on and his mother was in the kitchen talking to a police officer.  Those two statements are contradictory.

f.    Christopher testified that the police told his mother she would go to jail and lose her apartment if they found anything in the apartment, if she did not sign the

13

forms.  However, without her signature on the forms, police would not have been able to search to find anything to send her to jail for.

g.  Christopher testified that about two hours after the first police officers arrived, Detective Garza arrived (Tr. at 85).  He also testified that police were there for a total of four or five hours (Tr. at 88).  However, it was established by all of the other evidence that the search of the home was either finished or almost finished by the time Detective Garza arrived.  There is no explanation in Christopher's testimony as to why the police would have remained another two to three hours after the search was completed.

### III. STANDING TO CHALLENGE CONSENT

The first issue is whether defendant has standing to challenge the voluntariness of his mother's consent.  Fourth Amendment rights are personal rights that may not be asserted vicariously.  <u>Rakas v. Illinois</u>, 439 U.S. 128, 133-34 (1978); <u>United States v. Barragan</u>, 379 F.3d 524, 529 (8th Cir. 2004).  An individual asserting Fourth Amendment rights "must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable".  <u>Id</u>., quoting <u>Minnesota v.</u>

14

<u>Carter</u>, 525 U.S. 83, 88 (1998).  If a defendant fails to prove a sufficiently close connection to the relevant places or objects searched, he has no standing to claim that they were searched or seized illegally.  <u>United States v. Gomez</u>, 16 F.3d 254, 256 (8th Cir. 1994).

I have been unable to find a case with facts matching those at issue here.  In <u>United States v. Barragan</u>, 379 F.3d 524 (8th Cir. 2004), the driver of a car consented to its search, and the passenger of the car later challenged the seizure of items found during the search on the ground that the consent had been revoked.  The court held that the passenger did not have standing to challenge the search of a compartment of the car, as he was a "mere passenger."

In <u>United States v. Cellitti</u>, 387 F.3d 618 (7th Cir. 2004), Cellitti and his fiancée were arrested after an assault during which they were both seen in a car.  They were found by police, however, in a residence.  When police later found the fiancée's car, they obtained her consent to search it and then released her from jail.  Cellitti challenged the consent as coerced, and the government argued he had no standing because it was not Cellitti who gave the consent.  The court of appeals disagreed, holding that Cellitti had standing to challenge the search of the car

15

because he had a privacy interest in that car.

I have been able to find no case wherein a defendant challenged the voluntariness of the consent of a third party to search a residence. However, it is clear that the inquiry focuses on whether the defendant had an expectation of privacy in the place searched. In this case, the evidence establishes that although defendant did not live in the residence, he had a key and visited his family there.

The Eighth Circuit has held that a person has no legitimate expectation of privacy in a residence when he does not live there, has no key, and has no access other than when he visits the resident. United States v. Wiley, 847 F.2d 480, 481 (8th Cir. 1988); United States v. Nabors, 761 F.2d 465 (8th Cir.), cert. denied, 474 U.S. 851 (1985). A regular overnight guest, however, does have a legitimate expectation of privacy in the residence. United States v. Perez, 700 F.2d 1232 (8th Cir. 1983), cert. denied, 468 U.S. 1217 (1984).

In United States v. Haydel, 649 F.2d 1152, 1155 (5th Cir. 1981), the court relied on the following factors in concluding that the defendant possessed a legitimate expectation of privacy in his parents' home: (1) the defendant's parents gave him a key to their home, thereby

16

providing him with virtually unencumbered access; (2) the
defendant stored clothing at his parents' home and
occasionally remained there overnight; (3) the defendant
conducted a significant portion of his gambling activities
at his parents' home and he owned the records seized; (4)
the defendant apparently possessed the ability to exclude
others from his parents' home; and (5) the defendant
exhibited a subjective expectation that the contents of the
box stored under his parents' bed were to remain private.
In United States v. Rackley, 742 F.2d 1266, 1270 (11th Cir.
1984), the court stated that although there was testimony
that Rackley possessed a key to his host's home and stayed
overnight there several times, he did not stay in the house
immediately preceding the search and did not keep a full
wardrobe in the house when he was there. Based on those
facts, the court held that if Rackley possessed an
expectation of privacy, it was limited to the guest bedroom
and, because no evidence was seized in the guest bedroom,
his expectation of privacy in the guest bedroom was of no
legal consequence. Id.

In this case, there is no evidence as to whether
defendant ever spent the night at his mother's residence,
whether he kept clothing or other personal belongings there,

17

or whether he had the ability to exclude others from the residence. Defendant's brother testified in his affidavit that one of the bedrooms was used by his mother and niece, one was used by himself, one was his sister's (although she had recently moved out, her belongings were still there), and the fourth bedroom was empty. There simply is not enough evidence in this record to determine whether defendant had a legitimate expectation of privacy in his mother's residence.

However, because I find that the consent to search was voluntary, the issue of standing is irrelevant.

## IV. *VOLUNTARINESS OF CONSENT*

Defendant argues that his mother's consent to search the residence was not voluntary.

Even when police officers have neither probable cause nor a warrant, they may search an area if they obtain a voluntary consent from someone possessing adequate authority over the area. United States v. Matlock, 415 U.S. 164, 171 & n. 7 (1974); Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973). A voluntary consent need not amount to a waiver. United States v. Chaidez, 906 F.2d 377, 380 (8th Cir. 1990). Consent can be voluntary without being an "intentional relinquishment or abandonment of a known right or

18

privilege." <u>Bustamonte</u>, 412 U.S. at 235. The proper test is whether the totality of the circumstances demonstrates that the consent was voluntary. <u>Id</u>. at 226.

The government bears the burden of proving a voluntary consent to search by a preponderance of the evidence. <u>Bumper v. North Carolina</u>, 391 U.S. 543, 548 (1968); <u>United States v. Ramey</u>, 711 F.2d 104, 107 (8th Cir. 1983). The question of whether the consent was voluntarily given is a question of fact for the trial court. <u>United States v. Cortez</u>, 935 F.2d 135, 142 (8th Cir. 1991); <u>United States v. Alberts</u>, 721 F.2d 636 (8th Cir. 1983). Consent is voluntary if it was "the product of an essentially free and unconstrained choice by its maker" rather than the product of duress or coercion, express or implied. <u>Bustamonte</u>, 412 U.S. at 225, 227. This determination depends upon the totality of the circumstances in a particular case. <u>Id</u>. at 226.

In this case, the credible evidence establishes that defendant was being chased by police after someone reported a disturbance involving defendant being armed with a weapon. He ran into his mother's residence after using a key. He was inside the house for a few minutes, then came outside and surrendered. The police went inside the residence and

19

encountered defendant's mother downstairs. They told her
they believed defendant had left a weapon in the residence,
and she gave them permission to look for it. They could not
find it in the area of the door where defendant had entered
and exited. Mrs. Pulluaim told the officers that defendant
had gone upstairs after he came inside. They asked her
permission to search the residence, emphasizing the danger
of having a weapon in the house. She consented and signed a
consent-to-search form. Police found the gun and drugs
during the search. Once Detective Garza arrived and noticed
that no one had signed the consent-to-search form as a
witness, he sat down with Mrs. Pulluaim and made sure she
had voluntarily consented to the search. During that
conversation, Mrs. Pulluaim was upset about her son having
contraband in her home, and she asked whether she would lose
her Section 8 housing as a result. Detective Garza said he
did not know.

There is no credible evidence that Mrs. Pulluaim[1] was
threatened or coerced into signing the consent-to-search
form.

---

[1]Mrs. Pulluaim did not testify, as she passed away on
March 17, 2006 -- four months after defendant was charged in
federal court and seven weeks before defendant filed his
motion to suppress.

## V.  CONCLUSION

Based on the above-stated findings of fact and the law as discussed in sections III and IV, I conclude that there is insufficient evidence to determine whether defendant had a legitimate expectation of privacy in the residence searched, but that in any event Joyce Pulluaim voluntarily consented to the search of her residence.  Therefore, it is

RECOMMENDED that the court, after making an independent review of the record and the applicable law, enter an order denying defendant's motion to suppress.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has ten days from the date of this report and recommendation to file and serve specific objections.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
June 23, 2006

21